If I could reserve two minutes for rebuttal, I'd appreciate it. If it pleases the Court, my name is Bill O'Connor. I represent the appellant, Mr. Carpenter, in this matter. This is different than the Court's been hearing. This is a 42 U.S.C. 1983 action involving discrimination based on association. The test under Redmond, the first test admitted that the action was taken under color of state law. The only question for the Court is did the conduct deprive the plaintiff of a federal constitutional or statutory right? We're talking about a school situation here. The schools have the right to either be an open or closed forum. They don't have to let people come in, or they can let people come in as their choice. They have the right to control and have one-sided presentations. Those have been before the courts dealing with things like commercial speech, which is signs on the outfield of a baseball field, or with regard to bulletin boards, as in the Downs case. They can control those things. The question here is once someone is given a right, are they entitled to take it away? The school has stated in their brief, and I believe it is a rather succinct summary of what happened, is the goal of the appellee in the school district to be neutral in the discussion of religion by not giving a speaker access to a school assembly who might have a particular theological position, thereby causing the children to believe the school is promoting one religion over another. I think that is exactly what the school believes. I believe, however, that that is contrary to the law. There is no need. Cases go back, but a rumor, R-O-E-M-E-R, is a case on point that religion does not allow one to be quarantined. And, in fact, the Court goes on in rumors citing the Bradfield case that a person of religion can work for a state for a secular purpose. Counsel, what's the valuable government benefit that your client was deprived of here? It's twofold, Your Honor. He was deprived of the right to speak, which he does for a living. He has a business. He actually has two companies. One is Get Real, which gives motivational speeches to children, secular things. And he has another company called Solid Rock Associates, which gives motivational speeches with a religious bent to them. So did he actually lose money when this happened? Yes, Your Honor. It's not in the record how much money he lost, but it is in the record that he was paid separately for the speech to the schools rather than a speech he was giving later to the- Somebody paid him $1,000 to do something. The Dawson Ministerial Association, Your Honor, which is a group of non-denominational ecumenical group in the town. So was that money taken away from him then when this happened? Your Honor, that's not in the record, and I'll be honest, I do not know. Okay. So where does the record show about whether he actually lost some of his living from this case? The record only shows that he was to be paid separately for them and that he was not able to give this speech. There is no record. So we don't know from this record whether he was going to be paid specifically for this speech? We do know that he was going to be paid separately for the speech. That's in the record. Whether he did not get paid, I do not know. That's not in the record. The record doesn't tell us if Dillon Ministerial did not pay him the- That's correct. That's it. We're not asking for damages for the lack of speech. The court in the Republican- You were about to tell me, though, there were two prongs to your answer. You said there were two things that he lost by way of valuable government benefit, and you said the first was that he was paid for his time and possibly lost that. We don't know. Right. And the other one is simply the right to speak, the exercise of his rights to speak, which were denied after it had been given to him. The question talked about in the Rosenberg case and, more importantly, in the Rutan v. Republican Party case, it's not a question of the value. Whether a person is fined a penny for being a Republican or denied a penny for being a Republican is not the issue. The issue is the right. How do you tie that into being deprived of a government benefit? The benefit- First of all, on the first issue of the $1,000, maybe I'm mistaken in this, but I thought the record would indicate he was paid that $1,000, and there's no evidence that it was taken away. Maybe I'm wrong in that. I believe the record says, and I can look it up in the record, that he was paid to be paid not by the school district, but he was paid by the ministerial association, and that he was paid separately for giving the speech at the school. Okay. So the record doesn't show that he was actually paid the $1,000? The record does not show either way. It's ambiguous whether he got the pay or not, I guess. I believe it's the same because it's a loss of a fundamental right which had been bestowed upon him.  Go ahead. Well, that's on that point that you're on. I wanted to just ask you to explain why that's a governmental benefit. There are free speech rights, but why does it come within the governmental benefit? School is allowed to bring someone in to give a speech. The Rosenberger case talks about that. And when they are asked by the school to give a speech under the auspices of the school, school is allowed to control to a certain extent that speech. Once he is invited in, he has been given the right to speak. That is a right because it has to be granted by someone given the closed forum of the school. Once he is given the right to speak, it cannot be taken away for reasons that are discriminatory based on his association. Let me just make sure I understand your argument. Let's assume for the sake of my question that there's not a freestanding First Amendment right for him to come in and give this speech at the school in the first instance. That's correct. But the school decides for whatever reason that they want to allow him to come speak. You're saying that that voluntary opportunity that was given but not required constitutionally to be given can't be taken away? I'm saying it cannot be taken away for grounds that violate the First Amendment right of association. So even though they never had to invite him to speak in the first place, they could never uninvite him once invited without being subject to this lawsuit? No, that's not correct, Your Honor. They could not uninvite him for a reason that is because of a protected class, that is because of his association rights. It's no different than if you were volunteering for the Department of Justice or something or you're offering free-to-bag groceries for tips at a military installation. It may not be being paid by the government, but it is a right, and it can be taken away. I believe the Court said in both those instances they can be taken away for a myriad of reasons. However, they cannot be taken away for an exercise of a protected right, which is a freedom of association or freedom of speech. Those cases are cited in my brief. I believe they are the Highwood case, Your Honor, and the Highland case, Your Honor. I'm familiar with those cases. Thank you, Your Honor. Let me ask this. I think this is a very interesting and a difficult case, but let me ask you this question. Let's assume that the school board offered him an invitation to speak, and subsequently that, which I don't think is in the record here, but just to make it extreme, they got a letter from the counsel of the school board saying that to let him speak would be an establishment clause violation in light of the proximity to the youth rally that evening, the temporal process. That letter came, actually. Pardon me? That letter did come. Okay. But did it come before they made their decision? Yes, Your Honor. In fact, the deputy county attorney, Mr. Coughlin, as well as the statewide school board association, they sent him a letter saying basically we shouldn't let him speak. It's in the record. Because he's associated with this Christian group, they're also having a rally. Does it say it would be an establishment clause violation? They say it would subject the ñ could subject the school district to a lawsuit because of the establishment clause. They do say that, Your Honor. Yes. Well, I guess anything can subject either side to a lawsuit in a sense. But let's assume the letter was even stronger than what it said. Right. It said you will be liable for violating the establishment clause. Okay. And if I go back to Judge Graber's question, would your position be that once the school gives him an offer to speak, that they can never rescind it based on anything relating to speech? The fact that they may or may not have gotten bad legal advice advising them to rescind it, if they rescind it based on association with a religious group, then ñ or because, as you say, they have ñ he has another speech that evening. The situation there is effectively chilling, which the courts have recognized you can't have a chilling effect on association or speech. The situation is that what you're saying, what the message you're sending out is not we don't want our children to know someone is a Christian or a non-Christian or whatever. It doesn't make any difference what group to which they belong. The situation is there. We are not going to let you speak, having given you the opportunity to speak, once we find out you belong to an association to which we do not either agree or to which we differ or whatever. So I think we'd have children. It would be a slightly ñ I mean, I don't know whether slightly or greatly, but it would be a different case if there weren't an immediate, shortly thereafter, rally to be held that the same individual as attended. I don't think it makes any difference to you. If I hire somebody to ñ No, does it make any difference in your mind? Because it might make a difference as to whether the school board would be liable for having him speak at the school. It does not make a difference in my mind, no. The school is not going to have liability by inviting a priest or an advocate of any religion to be a speaker at the school on ethical values, I don't think, just by virtue of their affiliation. Right. But they might be if that person is immediately after the school doors close holding a religious-oriented rally. Well, in your example, Your Honor, if you invite a priest to give a speech on philosophy and that afternoon after school he's giving ñ he's saying mass, to which everybody is invited, or at least people are invited, that would be the same analogy. I think the problem you have is that, again, what we're talking about is the freedom of association. The person is asked to speak on a secular topic. He agreed as part of the foundation sets forth the agreement. There were two things the school district said. One is that all parents will be notified, they can opt out. That's typical in any school. It sounds like a contract problem more than a 1983 problem. Well, it would be a contract problem, except that the basis of it was he didn't have a ñ I guess you could say it's a contract. I mean, it sounds like, well, they broke the promise. They promised me I could come talk to these kids, and now I can't. Yes, except it's a government, and the government gave them the right to talk to these kids, which they do not have to give. But, yes, it's very analogous to a contract. They gave them an opportunity. I'm not sure. You're saying that once they gave them that opportunity, it ripened into an irrevocable right. No, it's not irrevocable. It's only if, for example, the gym had a flood or if, for example, they found out, oh, gee, the SATs are going to be given in the gym at the same time or quite a ñ any number of reasons. But what they can't do is say the reasons are, as found by the court, concern whether he proselytized. The fact that the plaintiff was an employee of a Christian evangelist ñ or was an employee of a Christian evangelist. The fact that the plaintiff was affiliated with Dawson McAllister Association, which gives religious speeches. The fact that the plaintiff was scheduled to the master of ceremonies at a Christian rally the same evening. The potential for legal ñ the potential for legal repercussions, the assembly went forward, separation of church and state issues, and response from members of the building community. If the test articulated by the court in the Mount Healthy School Board case, the Rowe case, and the Pickering case all say if the protected contact was a substantial or motivational factor in the denial of the benefit, if the court concedes, and I believe they should, that there was a benefit because it did not have to give them the opportunity to speak, they cannot deny it any more than they can deny a volunteer any more than they can deny anyone other benefits other than for legitimate reasons that are not connected with his right to associate with a particular group which they either disagree or don't disagree. Okay, once they give him the offer to speak there, and he agrees to be a speaker, you would argue they're not just giving him an opportunity to speak, they're giving him a benefit, a government benefit within the meaning of the ñ I guess it's Perry v. Cerner. That's right, Perry, yes. Yes, Your Honor. So that speaking opportunity is a governmental benefit. That's correct. Under your theory, and therefore it can't be taken away for an associational reason. That's correct. I gather I'm out of time. All right. Thank you. Thank you. I believe I reserved two minutes, but I don't know how that works. Thank you. Judge Crakerson might be willing to give you two minutes, Doctor. I'll argue that he should. Where are you going? Williams, Montana, which we are actually from, Perry. So you might have to have a ñ like a holiday in Seattle for a day. Okay. May it please the Court. My name is John Crist. I'm also from Billings, Montana. I'm here today ñ You should have told us. We would have put you on first. Yeah. I was advised that by the very gracious Court, Your Honor. I looked at the thing that said 930. I said, oh, no problem. Yeah. All right. My name is John Crist.     Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.     The first is for the courtís counsel, Mr. Oconnor, and the second is for the tenant. I'd like to first address a couple of the questions that the court raised in Mr. O'Connorís argument. The first has to do with whether he got to keep the money. He did. In his deposition on Pages 31 and 32, I asked him, ìHow much had the Dillon Ministerial Association agreed to pay you?î I think for the time I was there, a thousand dollars for everything, and later I said, ìDid you get paid that full amount?î Answer, ìSorry. Did you get paid that full amount?î Answer, ìYes.î Question. ìEven though you were unable to do the assembly?î Answer, ìYes.î So he did, in fact, get the entire fee that he had contracted for that particular week. You still have to address his argument that the speaking opportunity becomes a governmental benefit. Yes. And I would like to address that, Your Honor. I disagree strongly. Simply extending an invitation to an individual to speak at a, what we all agree is a school-sponsored nonpublic forum doesnít ripen into some right, and I think this Courtís decision in the Lisande case is a good example of that. There was a student who was an excellent student, a salutatorian, I believe, of his high school class, was given an invitation to come speak at the graduation ceremony. When it became clear to the principal that the subject matter of the speech was going to be highly religious in nature, they told him he couldnít do it. And my point would be that under Hazelwood, we all agree, it is not in dispute that this is a nonpublic forum, that the assembly is school-sponsored speech. And under Hazelwood, that means that the school has broad discretion to limit the existence or content of speech without running afoul of the Constitution, so long as its actions are reasonably related to legitimate pedagogical concerns. There is no case that I am aware of that states that the broad discretion granted to school boards in Hazelwood is somehow obliterated simply because the invitation is extended. Were that the case, this Court could not have told Mr. Lasande that he is unable to give the speech he wanted to give since the invitation had previously been extended. I want to talk about a couple of other points. The first is the entire line of cases relied on by the appellant looking at Perry v. Sinderman and Mount Healthy v. Doyle. My view is that theyíre simply analyzing this in the wrong way. Those are cases that provide that a person who may be denied a governmental benefit for a number of legitimate reasons cannot be denied such benefits for exercising constitutionally protected speech or association. I think that entire line begs the issue. If youíre going to apply that in the school situation, youíre going to, in effect, obliterate Hazelwood. Youíre going to say that the same sorts of protections, constitutional protections that apply outside the context of a school or outside that, that very nonpublic forum ought to be brought into, ought to be brought into the school. It is clear under Hazelwood that a school can limit the content or even the existence of speech, even where that would deprive an individual of a constitutional right that he enjoys in some other forum. And if youíre going to apply the Mount Healthy line of cases, youíre, in effect, obliterating the broad discretion that I believe is granted in Hazelwood. I want to address the idea that kind of permeates the briefs that my clients reached this decision because ñ solely because Mr. Carpenter was a Christian or was associated with a Christian youth group. And, you know, clearly from this record, you canít deny ñ we certainly wouldnít deny or argue that the concerns that caused the Board to withdraw this invitation are bound up with the fact that Mr. Carpenter was a Christian evangelical speaker, that he was in town as part of a Christian rally sponsored by the Dillon Ministerial Association, that he was going to be speaking in what the Dillon Ministerial Association wanted to be a mandatory assembly, and then three hours later was going to be the emcee at this crusade they called the Storm handing out T-shirts, and that the appearance that that created and the controversy that that created and the fear of litigation that was expressed to the Board all came into play at that point in time. Well, what is the record? This is just a factual point, I guess. But clarify for me your position on the record with regard to this assembly. You just said Dillon wanted it to be mandatory attendance, and I think your colleague argued that the parents had to consent. It actually evolved over time a bit, Your Honor. Initially, when the approval was granted, it was to be during school hours but with parental permission slips. When the controversy arose over the course of the next two weeks, there were some discussions about it, and in the context of the second meeting, there were discussions about, well, what if we had it after school? What if we just made the facility available to you during non-school hours? Those sorts of things. And the Dillon Ministerial Association was at that point in time insisting that it be mandatory, and actually the newspaper accounts are probably some of the most interesting parts of this record as to what was going on in these meetings. But because they couldn't reach some agreement and because the ministerial association was asking that it be mandatory, it ended up, that ended up being part of the decision to cancel it altogether. That's all in the record? It is in the record, Your Honor. And in fact, it is also in the record that what they ended up doing is allowing any students who wished to attend the assembly, the Dillon Ministerial Association rented a theater, and students were allowed to leave school premises and go to the theater that morning with parental permission. They were transported there by the Dillon Ministerial Association. And Mr. Carpenter admits in his deposition that the only thing that really changed ultimately for him was the location of the speech. Going back to kind of this notion that permeates the brief that if they give consideration to the fact that he's an evangelical Christian and his associations, I think if you say that a board can't consider those sorts of things, you're really stripping from them as a practical matter their ability to make any kind of reasoned judgments or decisions. If I come to the town of Dillon and I'm a neo-Nazi survivalist, and we have some of those in Montana, and I want to give a speech on morals and values, it is perfectly appropriate for that school board to inquire into my background, into my associations, to find out who and what I am before it's going to allow me an assembly with 11- to 14-year-old children during ordinary school hours. If you make it parallel to this case, let's say the school board tells a neo-Nazi that he can be a speaker, and then a controversy arises in the community, and they rescind it. Sure. And say, you know, speak somewhere else. Correct. Does that make any difference? I don't really think that it does. I mean, I think that in one case you're talking about political beliefs, in the other case you're talking about religion. But the broad powers, the broad discretion that the school board has under Hazelwood has to be extended to allow the board to consider facts that it learns over time. It has to be extended. One of the considerations is potential disruption, potential fear of litigation, potential controversy. All of those things, and the record is clear on this, occurred in the two weeks between the two school board meetings. If you're saying that a right springs into existence when they make a decision and that they can't change their mind, they can't exercise their discretion when they learn new things, then you're essentially stripping from them the powers they're allowed under Hazelwood. To sum up, we believe that the record is clear that the school board relied upon several perfectly appropriate bases for not allowing this speech to occur. In the court below, the appellant filed a cross motion for summary judgment representing the court that there were no fact issues in the dispute and the case was decided on that basis. So summary judgment is appropriate based on the facts in the record and the law as we have discussed it. Thank you, Your Honors. Thank you. Perfect timing. I've never seen such perfect timing. I've had that a few hours to practice. The conversation or the argument by counsel with regard to the speech by the valedictorian is a different case. The situation there was the individual gave a copy of a speech to school, and there are numerous cases. These are the prayer and the school cases, you know, the Wiseman and so on, and said, I'm going to proselytize during my closing, during my graduation commencement speech. They said no, because it's a school sponsored speech. You cannot proselytize. He refused to change to agree to that. Very different situation we have here. They said you cannot proselytize. He said fine. What they're then saying is that, well, we don't care if you agree to that or not, because we don't like who you associate with. We know, in spite of the fact that you've given us your word, that you cannot talk about anything else. That's no different than me coming here and saying to the court that I'm going to talk about Section 301 of the National Labor Relations Act. That has nothing to do with this case. Why would I raise it? If I'm hired to talk about one case, that's what I'm going to talk about, and that's what this gentleman did. He gave speeches for two different organizations, one of which I think he actually owned them both, but they were separate and distinct. He can make that distinction. He never said he would not comply with that. The court was also given the site to Hazelwood. In Hazelwood, it was a school newspaper, and there were some articles. I don't need to go into the facts. The court is very well in Hazelwood. The question I want to bring up here is that the court will intervene when decisions to censor have no valid educational purpose. In there, it was a class that there was this school newspaper. There were some real questions of journalistic integrity, and so it was educational. What it requires, judicial intervention, is to protect a constitutional right. The school had a right to censor. That was part of their school curriculum. Here, there was a situation where he had a right to speak, was given a right to speak, agreed to the boundaries they set up, and they must abide by their own boundaries. I believe that's the Highland case. If you set up boundaries, you have to abide by your own boundaries. You can't change them later because somebody in the community is upset, whether he be the deputy county attorney who goes to every school board meeting and starts saying, ha-ha, I found out he was a member of this organization, which we know is bad. Wasn't he going to announce his presence at the subsequent event? He specifically agreed. In fact, in the record, Your Honor, is a transcript. Before he was allowed to speak the first time, when they said you can come, he gave a copy of his usual secular speech to the school board. One of them saw it. In fact, she was the only one. She was not there at the final vote, but she wrote a letter, which is in the record, an e-mail saying, you know, what are we doing here? But did he give a secular speech? He has given these secular speeches. That is in the record. And so, you know, the distinction is very clear. He was not going to say, I'm not going to give a speech. I'm going to talk about he was not going to say, I'm giving a speech later today, which is a Christian rally. No, but was he able to say, I'll be giving a speech later in the day? No, he specifically was precluded. It's in the record. He was specifically. Your Honor, you're right. Go ahead. Okay. The question of disruption, just very briefly, that doesn't rise to the level of Tinker. The Court is familiar with Tinker. There was no disruption. There was no indication of a disruption in this class caused by this, and certainly it wouldn't rise to the level even of wearing black armbands. The control, the school had the right to control speech. And if he, I mean, I guess we'd go to the hypothetical, say he got up there and started speaking, went away from what he said he would do, away from the speeches he'd given in other secular institutions, which he continues to do across the country, and started saying, well, instead of just saying, you know, stay off drugs, stay in school, you know, your parents like you, life is good, start saying, stay off drugs, stay in school, your parents love you, and Jesus loves you, then he would have violated. But he didn't say that. There's no indication that he would. And the school, of course, has the option to pull the plug. What would he have violated? Was there an agreement? There was an agreement not to give a religious-based speech. But there was no, he wasn't, there was no agreement, like, governing the whole situation, right? Like, we'll pay you a thousand, we'll pay, he was being paid by the other order. By somebody other than the school. So did the school have a written agreement with him at the outset? The only thing, Your Honor, is at the school board meeting they had these two requirements. I don't know. An oral discussion, not a written agreement, correct? Your Honor, I believe it was set forth in the minutes of the school board meeting. Right, but all I'm saying is I understand there wasn't a written agreement between him and the school board at the outset. I don't. Defining the relationship or circumstances under. I don't believe so, Your Honor, no. Counsel has more of a photographic memory than I do, but he's shaking his head, so I don't think there was. Those are both smart cookies because you're Montana counsel. He doesn't have a photographic memory, he has a photogenic memory. Right, he remembers, it's on page 27, line 6, yeah, paragraph B. I know, you don't try to argue cases with him and other things. It's a very hard case and a difficult and interesting case. Is there anything else I think I'm definitely out of time? Thank you, Your Honor. When's the next flight? I believe he's got a 330 on, and my son, who is, my computer was, he's home from college, is trying to do whatever he can do to make me feel good. I'll try to get you on it. Yeah. Okay. Well, if you could both stay over in Seattle, you could. That's true, we could go out and have a beer, go to Marysville. Go out for dinner and figure this case out and give us a stipulated opinion. We had a cup of coffee right before the hearing and we agreed that this was a difficult case. Thank you all. Thank you. And happy anniversary. Thank you. We hope you make it back. We've been together long enough, we know what to do tomorrow. Good luck. Good luck. Thank you both. All rise.
judges: Pregerson, Graber, Gould